PAUL D. AMMERMAN,

                             Plaintiff,                      OPINION AND ORDER

    v.

                                                        17-cv-193-wmc

KALEB SINGLETON, ET AL.

                             Defendants.

*Pro se* plaintiff Paul Ammerman brought this claim under 42 U.S.C. § 1983, alleging that six current and former employees of the Wisconsin Department of Corrections violated his First and Eighth Amendment rights during his incarceration at New Lisbon Correctional Institution ("NLCI"). Now before the court is the defendants' motion for summary judgment. (Dkt. # 65.) For the reasons that follow, that motion will be granted.[1]

## UNDISPUTED FACTS[2]

### A. Overview of the Parties

Plaintiff Paul Ammerman was incarcerated at NLCI from February 2016 until July 2016, after which he was transferred to Columbia Correctional Institution ("CCI"). Plaintiff named six defendants, all of whom were employed during all relevant times by the Wisconsin Department of Corrections at NLCI. Three of the defendants were employed

---

[1] Also before the court is plaintiff's motion to strike defendants' reply in support of proposed findings of fact as untimely (dkt. # 83). The court denies this motion as defendants' reply was in fact timely; plaintiff cited the Local Rules for the *Eastern* District of Wisconsin, while this case is obviously before the *Western* District of Wisconsin.

[2] Viewing the facts in the light most favorable to plaintiff as the non-moving party, the following facts are material and undisputed for purposes of summary judgment, except where noted.

as security staff: Larry Fuchs was Security Director; Tim Crapser was a captain; and Shane Hinton was a lieutenant. The remaining three defendants were employed as psychological staff: Denise Romanow was a psychologist; and Kaleb Singleton and Samuel Murphy were psychological associates. For ease, the court will refer to these two groups of defendants as the "security staff defendants" and the "psychological staff defendants," respectively.

### B. Facts Relating to Plaintiff's Eighth Amendment Claim

Prior to his incarceration at NLCI, Ammerman had been treated for mental health issues and had been diagnosed with dysthymic disorder in 2012.[3] During his six-month stay at NLCI, Ammerman was seen multiple times by psychological staff, which was more frequent than other inmates with similar clinical psychological needs during that period.

According to defendants, psychological staff cannot prescribe medication; only Health Services Unit ("HSU") psychiatrists can do so. (Reply to Pl.'s Resp. to Defs.' PFOF (dkt. #81) ¶ 27.)[4] Even so, the evidence cited by plaintiff suggests that HSU staff may sometimes review PSU notes in deciding whether to prescribe medicine. (*Id.*) And

---

[3] Also known as persistent depressive disorder, dysthymia is a "chronic (ongoing) type of depression in which a person's moods are regularly low." *Persistent Depressive Disorder*, Medical Encyclopedia, U.S. National Library of Medicine (Sept. 11, 2019), https://medlineplus.gov/ency/article/000918.htm.

[4] Plaintiff objected that "[t]his [statement] is not entirely true as the licensed medical doctor will not consider medication without a referral from psychological staff." (*Id.*) To support his objection, plaintiff quoted an HSU doctor's note in response to Ammerman's request for medication which stated, "I have reviewed the mental health screening from 2013 and the recent PSU notes. There is NO indication for medication referral. You can work on NON-medical ways of dealing with your mood + anxiety." (Reply to Pl.'s Resp. to Defs.' PFOF (dkt #81) ¶ 27.) However, that note does not fully support his factual assertion. At most, it suggests medical doctors may look to psychological staff for medication referrals.

defendants admit that PSU staff may refer patients to see an HSU psychiatrist. (*Id.*) Therefore, the court considers it undisputed that PSU staff cannot formally prescribe medication, but that they may refer a patient to HSU for a possible medical prescription.

On April 12, 2016, Ammerman was seen by Psych. Assoc. Samuel Murphy. This was Murphy's first contact with Ammerman. During the appointment, Ammerman reported having anger issues and requested medication. Murphy discussed "non-medicated techniques" with Ammerman and provided him with handouts on the topics of anxiety, depression, sleep and relaxation. However, Murphy neither prescribed medication nor reached a diagnosis.

About four weeks later, on April 29, 2016, Ammerman had an appointment with Psychologist Denise Romanow. Not Ammerman's regular clinician, this was the only direct contact Romanow had with Ammerman, who apparently brought along to that appointment a psychological report that he had received from another doctor before his incarceration at NLCI. In response to Ammerman's request that she review his previous psychological records, Romanow declined to consider the specific report he had with him, but she did give him a release form so that all his records could be obtained. During that appointment, Ammerman also reported that he was taking Gabapentin and was experiencing "blurred vision" and "moodiness," prompting Romanow to follow up with an HSU nurse regarding Ammerman's complaints. In response, Romanow was apparently told that Ammerman had an HSU appointment regarding the symptoms scheduled in June. Finally, Romanow encouraged Ammerman to review the materials he had previously received from PSU and to contact PSU if necessary in the future.

Ammerman was again treated by Murphy on June 3, 2016, and reported having "anger issues and depression." (Murphy Decl. (dkt. # 71) ¶ 18.) At that appointment, Murphy again declined to prescribe medication or reach a diagnosis, but he did schedule a follow up appointment for June 20, 2016, to be seen by Psych. Assoc. Kaleb Singleton, who was Ammerman's primary mental health care provider at the time. Singleton diagnosed Ammerman with antisocial personality disorder and discussed coping skills with him. Although Ammerman also believed himself to be depressed, Singleton did not diagnose him with depression.

Just a few days later, on June 24, 2016, Ammerman sent a complaint to Security Director Larry Fuchs, which Fuchs received on June 27, 2016. In that letter, Ammerman complained about the treatment he was receiving from PSU. The day after Fuchs received the complaint, he responded by instructing Ammerman to continue to work with the clinical staff.

On June 26, 2016, Ammerman also submitted a Psychological Services Request for depression medication, to which Singleton responded by directing Ammerman to submit a Health Services Request form. Ammerman apparently did so, but the psychiatrist on duty declined to prescribe any medication, again instructing Ammerman to work on non-medical ways of dealing with his mood and anxiety.

## C. Facts Relating to Plaintiff's First Amendment Retaliation Claim

During Ammerman's June 20 appointment with Singleton, he also made specific threats to stab two correctional officers. Singleton not only reported those threats, but also authored a conduct report against Ammerman on June 22, 2016. After admitting his

guilt, Ammerman was disciplined. This was actually the second conduct report Ammerman received at NLCI, having been written up and disciplined for threatening to assault an inmate in March 2016.

On June 29, 2016, Singleton authored yet another conduct report against Ammerman for conduct that allegedly occurred on June 28, 2016. (Singleton Decl., Ex. 1004 - 000021 (dkt #68-3).) That report was ultimately reviewed by Lieutenant Shane Hinton, who determined that it should be processed as a minor conduct report. There appears to be a genuine dispute as to the factual events underlying this third conduct report at NLCI. Defendants allege that Ammerman said, "Fuck you Singleton. Fuck your bitch ass. I'll get you when I get out of here!" (Singleton Decl. (dkt. #69) ¶ 26.) Plaintiff disputes this, citing to a declaration by Philip Novak, another inmate, which states, "I heard that Mr. Ammerman received a conduct report for threatening Dr. Singleton. I am here to bear witness that Mr. Ammerman did no such thing." (Novak Decl. (dkt. #76).) However, this dispute need not be resolved, since it is not material to the motion before the court for reasons explained below.

Also on June 29, 2016, the Institution Complaint Examiner ("ICE") received a complaint from Ammerman against Singleton, Murhpy and "Jane Doe" (likely Romanow) regarding his medical treatment. In investigating that complaint, the examiner interviewed Singleton and reviewed the two conduct reports he authored against Ammerman.

At some point after the three conduct reports were filed, Fuchs approved a "Special Placement Needs" ("SPN") for Ammerman. The SPN was removed, however, after Warden Strahota had reviewed it and determined that it did not meet the SPN policy

requirements.  (Fuchs Decl. (dkt. # 72) ¶ 18.)  Even so, the SPN triggered an early review of Ammerman's custody level by the Program Review Committee ("PRC"). [5]  (Singleton Decl., Ex. 1006 - 000008 (dkt. #69-5) 8.)  The members of the PRC (none of whom are defendants in this case) unanimously recommended that Ammerman be elevated to maximum custody.  As a result, Ammerman was transferred to Columbia Correctional Institution, a maximum security prison.

## OPINION

Plaintiff brings two civil rights claims.  First, he asserts that NLCI Security Directory Larry Fuchs and the psychological staff defendants -- Singleton, Murphy and Romanow -- were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.  Second, he claims that Singleton and the security staff defendants -- Fuchs, Hinton and Crapser -- retaliated against him after he expressed complaints about his medical treatment in violation of the First Amendment.  Defendants move for summary judgment on both claims.

Summary judgment is appropriate where the moving party establishes "that there is no genuine dispute as to any material fact," and it "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must "constru[e] all facts and draw[] reasonable inferences in the light most favorable to the non-moving party."  *Alexander v. Casino Queen,*

---

[5] Defendants alternatively referred to this committee as the "SPN committee" (Defs.' Reply to Pl.'s Resp. to Defs.' PFOF (dkt. # 81) ¶ 35), "Parole Review Committee" (*id.* at ¶ 64), "classification committee" (*id.* at ¶ 57), and "Program Review" committee (Fuchs Decl. (dkt # 72) ¶¶ 19-20.)  For clarity, the court will refer to it as the "Program Review Committee" or "PRC."

*Inc.*, 739 F.3d 972, 977 (7th Cir. 2014).  However, because the burden of proof ultimately rests with the plaintiff, at summary judgment Ammerman "cannot merely allege the existence of a factual dispute."  *McPhaul v. Bd. of Comm'rs of Madison Cty.*, 226 F.3d 558, 563 (7th Cir. 2000), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).  Instead, he "must supply evidence sufficient to allow a jury to render a verdict in [his] favor."  *Id.*  For the reasons explained below, plaintiff here has failed to meet this burden.

## I.  Plaintiff's Eighth Amendment Claim

The Eighth Amendment imposes an obligation on the government "to provide medical care for those whom it is punishing by incarceration."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  This obligation is violated when prison officials "display 'deliberate indifference to serious medical needs of prisoners.'"  *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (quoting *Estelle*, 429 U.S. at 104).  A claim of such a violation includes two elements: (1) "an objectively serious medical condition" and (2) "an official's deliberate indifference to that condition."  *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)).  A court should "examine the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs."  *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) (citing *Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999)).

**A. Serious Medical Condition**

An objectively serious medical condition "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno*, 414 F.3d at 653 (citing *Foelker v. Outagamie County*, 394 F.3d 510, 512-13 (7th Cir. 2005)). The Seventh Circuit has repeatedly held that psychiatric or psychological conditions may be a serious medical condition. *See, e.g.*, *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987); *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983). Moreover, to establish the existence of a serious medical condition, a prisoner need not "provide 'objective' evidence of his pain and suffering." *Greeno*, 414 F.3d at 655 (citing *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996)). This is because "[p]ain, fatigue, and other subjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition." *Cooper*, 97 F.3d at 917.

Even so, defendants argue that plaintiff cannot prove an objectively serious medical condition: "Did Ammerman need treatment (or, the medication that Mr. Ammerman desired)? The answer is 'No.'" (Defs.' Br. in Support of Mot. for Summary J. (dkt # 66) 20.) As an initial matter, defendants frame the inquiry too narrowly. The relevant question is whether the plaintiff has a serious medical condition, *not* whether the plaintiff needed a particular kind of treatment. *See, e.g.*, *Greeno*, 414 F.3d at 653 (severe heartburn and frequent vomiting constituted an objectively serious medical condition); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (tooth decay was objectively serious medical condition); *Norfleet v. Webster*, 439 F.3d 392, 395 (7th Cir. 2006) (arthritis is serious

medical need). Ammerman's alleged need for medication is more properly considered as part of the second element, which generally concerns the appropriateness of defendants' response to Ammerman's condition.

More importantly, the court disagrees with defendants' broader claim that plaintiff cannot establish the first element. Plaintiff has proffered sufficient evidence that his psychological disorders presented an objectively serious condition. First, Singleton diagnosed Ammerman with antisocial personality disorder while incarcerated at NLCI, and even before his incarceration, Ammerman had been diagnosed with dysthymic disorder. Second, Singleton's declaration states that a diagnosis of antisocial personality disorder is "generally treated by cognitive-behavioral interventions." (Singleton Decl. (dkt # 69) ¶ 14). From this evidence, a reasonable jury could conclude that plaintiff's condition had "been diagnosed by a physician as mandating treatment." *See Greeno*, 414 F.3d at 653. Third, plaintiff argues that his self-reported, psychological issues should be considered. For example, in a psychological services request on June 2, 2016, Ammerman wrote that he has been "trying to see the psychologist about [his] anxiety, depression, and anger issues." (Pl.'s Br. in Opp'n to Mot. for Summary J., Ex. 1001 - 000003 (dkt. #79-4).) Although subjective, such self-reports may properly be considered as evidence of an objectively serious medical condition. *See Cooper*, 97 F.3d at 917; *Greeno*, 414 F.3d at 653. This is especially true where, as in this case, the condition alleged is a psychological disorder which may present few, if any, objectively verifiable symptoms. Accordingly, plaintiff has presented sufficient evidence for a reasonable factfinder to conclude that he had an objectively serious medical condition.

## B. Deliberate Indifference

Plaintiff has not, however, met his burden of production as to the second element of his Eight Amendment claim. A claim of deliberate indifference to a serious medical condition requires proof that defendants acted with "a sufficiently culpable state of mind." *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (quoting *Greeno*, 414 F.3d at 653). While a prisoner does not need to "establish that officials intended or desired the harm that transpired," *Greeno*, 414 F.3d at 653 (citing *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002)), deliberate indifference is more than negligence or even gross negligence. *Figgs v. Dawson*, 829 F.3d 895, 902-03 (7th Cir. 2016). Specifically, the official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825 (1994).

As an initial matter, plaintiff cannot establish liability against Security Director Fuchs. As a non-medical official, Fuchs could "reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles*, 914 F.3d at 1049. Plaintiff appears to argue that Fuchs was deliberately indifferent when, after receiving Ammerman's complaint about PSU's treatment, he directed Ammerman to continue working with the clinical staff at NLCI. But this is not enough for a jury to conclude that *Fuchs* knew of and consciously disregarded an excessive risk to Ammerman's health, especially in light of Fuchs's reasonable deference to the medical judgment of the psychological staff.

As to the three remaining psychological staff defendants, no reasonable jury could find that they were deliberately indifferent either. Because the claim of deliberate indifference here is based on allegedly inadequate medical treatment, "[a] medical

professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (alteration in original) (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)). "Mere differences of opinion . . . regarding a patient's appropriate treatment do not give rise to deliberate indifference." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). Even more to the point, "[t]o infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet*, 439 F.3d at 396 (citing *Estate of Cole*, 94 F.3d at 262).

Here, plaintiff dedicates much of his brief to explaining that the psychological staff defendants (1) refused to rely on previous diagnoses received before coming to NLCI, and (2) would not accept his self-reported diagnoses. Plaintiff also complains that he was unable to receive medication for his mental disorders, specifically comparing one of Psychological Associate Murphy's non-medication treatments -- an anger management packet -- to "giving a band aid for a broken leg." (Pl.'s Opp'n (dkt. # 79) 12.) In response, defendants do not dispute the facts underlying plaintiff's arguments. Rather, they argue that the treatment provided by the psychological staff defendants was reasonable, and as such, certainly does not rise to the level of deliberate indifference.

As an initial matter, defendants argue that the psychological staff defendants cannot be held liable for failing to provide Ammerman with medication because psychological staff cannot write such prescriptions. At the same time, defendants admit that psychological staff *can* refer patients to a psychiatrist who could, in turn, prescribe medication. Moreover,

under certain circumstances, refusal to refer a patient to a specialist can amount to deliberate indifference. *See Greeno*, 414 F.3d at 655 ("[A] jury could find deliberate indifference from Dr. Daley's refusal over a two-year period to refer Greeno to a specialist or authorize an endoscopy."). So, psychological staff's inability to prescribe medication does not by itself relieve them of liability.

Even conceding this *possible* basis for liability, however, plaintiff has not presented sufficient facts for a reasonable jury to infer deliberate indifference. To the contrary, the undisputed record shows that Ammerman had at least four appointments with psychological staff defendants during his six months at NCLI. Moreover, staff provided him with various non-medication treatments, including discussions of coping skills and handouts on anger management. Additionally, defendants Romanow and Murphy offered specific reasons for why they did not rely on Ammerman's previous medical diagnoses. Specifically, Romanow testified that it is not her practice to review and rely on a patient's previous medical record "unless they are certified complete copies from the provider." (Romanow Decl. (dkt. # 70) ¶ 9.) She also noted that "diagnoses and mental health are subject to change over time." (*Id.*) Murphy similarly testified that "it is not appropriate to rely on a psychological patient's self-reported diagnosis because . . . [it] could be inaccurate, and diagnostics of a person can change over time or may have been incorrect initially." (Murphy Decl. (dkt. # 71) ¶ 12.)

Plaintiff argues that the psychology staff defendants' decisions not to rely on Ammerman's previous diagnoses may amount to deliberate indifference, citing to *McGill v. Duckworth*, 944 F.2d 344 (7th Cir. 1991), which suggests that deliberate indifference may

be found if the defendant goes "out of [his] way to avoid acquiring unwelcome knowledge." *Id.* at 351. However, such is not the case here. The psychological staff defendants did not go out of their way to avoid acquiring "unwelcome knowledge"; rather, they made a professional decision as to whether or not to rely on Ammerman's previous diagnoses and self-reported diagnoses. Although plaintiff may have disagreed with the psychological staff defendants' decisions, deliberate indifference cannot be established by evidence of mere differences of opinion regarding treatment. *See Estate of Cole*, 94 F.3d at 261 ("Mere differences of opinion . . . regarding a patient's appropriate treatment do not give rise to deliberate indifference."). Absent evidence that the treatment plaintiff actually received was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment," *Norfleet*, 439 F.3d at 396, "[w]hat we have here is not deliberate indifference to a serious medical need, but a deliberate decision by a doctor to treat a medical need in a particular manner." *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). Because plaintiff's complaints are neither supported by expert opinion, nor manifestly unacceptable to a lay person, the court will grant summary judgment to defendants on plaintiff's Eighth Amendment claim.

## II. Plaintiff's First Amendment Retaliation Claim

As noted above, plaintiff also alleges a First Amendment retaliation claim. At the summary judgment stage, a plaintiff "must 'show through specific evidence that a triable issue of fact remains.'" *Johnson v. Kingston*, 292 F. Supp. 2d 1146, 1158 (W.D. Wis. 2003) (quoting *Liu v. T & H Machine, Inc.*, 191 F.3d 790, 796 (7th Cir. 1999)). Plaintiff's "subjective belief that the action was retaliatory . . . does not alone create a genuine issue

of material fact." *Johnson v. Univ. of Wisconsin-Eau Claire*, 70 F.3d 469, 480 (7th Cir. 1995), *abrogated on other grounds by Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004). To state a prima facie case for retaliation under § 1983, plaintiff must produce sufficient evidence for a reasonable jury to conclude that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).

After he filed complaints regarding inadequate health services, plaintiff's basic claim is that Singleton and the security staff defendants (Fuchs, Hinton and Crapser) retaliated against him by (1) issuing a false conduct report against him and (2) approving an SPN for him, the latter of which led to his transfer to a maximum security prison. (Pl.'s Br. in Opp'n to Mot. for Summary J. (dkt. #79) 1.) Tellingly, however, Ammerman does *not* dispute that he committed the acts that led to his first two conduct reports he received at NCLI; he only claims that the third, June 29, 2016, conduct report was falsified and retaliatory.

Turning to the *first* element of a prima facie retaliation claim, Ammerman actually submitted two complaints that were arguably protected by the First Amendment. The first was the letter submitted to Fuchs complaining of the psychological care he was receiving. This complaint was written on June 24, 2016, and received on June 27, 2016. The second was a complaint received by the examiner on June 29, 2016. Defendants concede that at

least the latter complaint was protected First Amendment activity, and although they do not address the former complaint, it appears protected as well. *See Bridges v. Gilbert*, 557 F.3d 541, 554-55 (7th Cir. 2009) (confirming that prisoners have First Amendment right to petition for redress of grievances and that the petition does not need to take a specific form).

*Second*, the court considers plaintiff's alleged deprivations to determine if they "would likely deter First Amendment activity in the future." *Bridges*, 557 F.3d at 546. Defendants concede, and the court agrees, that a transfer to a maximum security prison is a deprivation that would likely chill speech. *See Higgason v. Farley*, 83 F.3d 807, 810 (7th Cir. 1996) ("If a prisoner is transferred for exercising his own right of access to the courts, or for assisting others in exercising their right of access to the courts, he has a claim under § 1983."). The court also concludes that a retaliatory conduct report is a deprivation that would likely deter future First Amendment activity. *Id.* at 552 (stating that unjust disciplinary charges may chill speech and may be a basis for an actionable First Amendment retaliation claim); *Greene v. Doruff*, No. 09-CV-291, 2010 WL 3809828, at *4 (E.D. Wis. Sept. 24, 2010), *aff'd in part, rev'd in part*, 660 F.3d 975 (7th Cir. 2011) ("Courts have acknowledged that receiving retaliatory conduct reports may deter inmates from exercising their First Amendment rights"); *Tate v. Jenkins*, No. 09-CV-169, 2010 WL 3809765, at *8 (E.D. Wis. Sept. 24, 2010) (noting that the issuance of a conduct report may be

"actionable if taken in retaliation for the exercise of a constitutionally protected right").[6]

However, the *third* element of the retaliation claim requires the most attention. A plaintiff has the burden of showing that the protected activity was "at least a motivating factor" in the defendants' decision to take a retaliatory action. *Bridges*, 557 F.3d at 546 (citing *Woodruff*, 542 F.3d at 551). Moreover, a defendant can *rebut* such a finding by showing "that the harm would have occurred anyway -- that is, even if there had not been a violation of the First Amendment -- and thus that the violation had not been a 'but for' cause of the harm for which he is seeking redress." *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011). Of course, the plaintiff may then show that the defendants' stated reasons were pretextual. *See Vukadinovich v. Board of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002). "To show pretext and to survive summary judgment," a plaintiff must "produce evidence upon which a rational finder of fact could infer that the defendant[s'] proffered reason[s] [are] lie[s]." *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 314 (7th Cir. 2017) (quoting *Zellner v. Herrick*, 639 F.3d 371, 379 (7th Cir. 2011)) (alterations in original).

As an initial matter, the court will dismiss plaintiff's claim against Captain Crapser as plaintiff failed to make *any* argument or present *any* evidence regarding his involvement

---

[6] Whether the issuance of an SPN in particular would likely deter First Amendment activity is more difficult to determine here, as neither party provides much information as to what an SPN is. Fuchs's declaration is the only evidence that provides a hint, suggesting that an SPN may be used to separate inmates from certain staff. (Fuchs Decl. (dkt. #72) ¶ 18 ("I put the SPN in place because . . . I wanted him separated from the staff he threatened.").) Regardless, for purposes of this motion, the court will assume that there may be circumstances where, if used in retaliation, such a separation could deter future speech, and therefore assumes without deciding that an SPN is also a deprivation that may form the basis of a First Amendment retaliation claim.

in the retaliation for which he seeks redress. *See Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.") (quoting *Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994)). As for Psychological Associate Singleton and Lieutenant Hinton, plaintiff's theory appears to be that they worked together to falsify the third conduct report as retaliation for Ammerman's lodging an ICE complaint. Singleton, for his part, testified that he filed that report because Ammerman swore at him and threatened him. In response, Ammerman provided a sweeping, general declaration from Novack, another inmate, claiming that Ammerman "did no such thing." Plaintiff argues that this declaration alone creates a dispute of fact over the legitimacy of the third conduct report, and as such defendants' motion for summary judgment should be denied. Although the court agrees that plaintiff has at least arguably demonstrated a genuine issue of fact,[7] plaintiff has *not* shown that it is material to his retaliation claim. Even if Ammerman is correct, and Hinton and Singleton did falsify their report, that act is only a First Amendment violation if they falsified the report *in retaliation* for Ammerman's ICE complaint, and because plaintiff has not alleged sufficient facts for a reasonable jury to find a retaliatory motive, that claim falls.

In order to establish retaliatory motive, a plaintiff must prove that the defendant knew of the protected conduct before the alleged retaliatory action. *Wackett v. City of Beaver*

---

[7] Novack's declaration does not really account for how he could bear witness to Ammerman *never* threatening Singleton, but the court will assume it is a good faith representation for now.

*Dam*, 642 F.3d 578, 582 (7th Cir. 2011) ("For a viable case, [plaintiff] must prove defendants' knowledge of the protected speech to establish retaliation."). With regard to Hinton in particular, *no* evidence has been presented that he knew about either of Ammerman's protected complaints; therefore, the court must dismiss the claim against him. To support his claim against Singleton, plaintiff points to undisputed evidence that ICE received his complaint on June 29, 2016 -- the same day that the allegedly falsified, third conduct report was authored -- and that the ICE examiner interviewed Singleton as a part of her investigation into that complaint.

Here, defendants point out that the examiner's notes reference the June 29, 2016, conduct report, which according to them shows that Singleton was interviewed about the complaint *after* the conduct report was filed. For plaintiff's theory to be true, the ICE examiner would have had to receive the complaint, interview Singleton that same day, then revisit the report after the allegedly falsified conduct report was filed, *and* include it in her final report. Although theoretically possible, the court is unconvinced that a reasonable jury could accept plaintiff's theory, even viewing the facts in the light most favorable to plaintiff. "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to prevail against a summary judgment motion, and that is all plaintiff presents here. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In particular, plaintiff presented *no* evidence, other than the ICE report itself, to establish that Singleton knew of either of Ammerman's complaints before the alleged retaliatory action. Therefore, the retaliation claim against Singleton will be dismissed as well.

Plaintiff's argument against Security Director Fuchs is similarly that Fuchs approved

an SPN classification for Ammerman in retaliation for his June 24, 2016, complaint. As support, plaintiff points out that the SPN was removed after Warden Strahota had reviewed it and determined that it did not meet the SPN policy requirements. It is also undisputed that Fuchs knew of the June 24, 2016, complaint as it was sent directly to him, and he responded to it.

Even assuming that plaintiff has presented sufficient evidence to support an inference that retaliation was a "motivating factor" for Fuchs, however, defendants have also presented undisputed rebuttal evidence. Specifically, in his declaration, Fuchs declared that he put the SPN in place because of the specific threats Ammerman made against two correctional officers on June 20, 2016 -- both threats that Ammerman *admitted* making. (Fuchs Decl. (dkt. #72) ¶ 16.) Although Fuchs acknowledged that "[t]hreats to injure others do not routinely warrant a SPN," he also explained that the SPN was put in place for the following reasons: "I felt there [were] clear and convincing reasons to believe Mr. Ammerman's threat would be carried out. I wanted him separated from the staff he threatened. The inmate had just come from maximum custody and had not completed anger management. Also, maximum security inmates at times struggle with all the freedoms that come with medium custody institutions." (Fuchs Decl. (dkt. #72) ¶ 18.) Not only does plaintiff present no evidence to suggest that these reasons were pretextual, but considering that he *admitted* to making the threats, no reasonable jury could infer that Fuchs's "proffered reason[s] [were] lie[s]." *See McGreal*, 850 F.3d at 314. While "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," and prisoners therefore enjoy the protections of the First Amendment,

*Turner v. Safley*, 482 U.S. 78, 84 (1987), "[n]ot being experts in prison administration, but aware of the security problems in American prisons, judges sensibly defer within broad limits to the judgments of prison administrators." *Toston v. Thurmer*, 689 F.3d 828, 830 (7th Cir. 2012) (citing cases). So, too, here.

In concluding that the June 29, 2016, conduct report and the SPN were not retaliatory, the basis for plaintiff's final argument for his transfer violating the First Amendment is undercut. Although defendants did not themselves approve the transfer, plaintiff basically argues that their impermissible motives in filing the conduct report and approving the SPN led to his transfer. At most, however, the PRC report regarding the decision to transfer Ammerman to a maximum security prison noted that the SPN merely prompted an "early review" of Ammerman's case. (Singleton Decl., Ex. 1006 - 000001 (dkt. #69-5) 8.)

In fairness, the committee *did* consider the allegedly falsified conduct reports in their review. (*Id*. at 3-4.) Under a cat's paw theory of liability -- wherein an improperly motivated individual may be held liable for influencing an innocent decision-maker -- plaintiff's argument is, therefore, at least facially plausible. Indeed, the Seventh Circuit has suggested, although has not explicitly held, that such a claim of liability may even be available under § 1983. *Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016) (noting that there is "precedent from five other circuits for imposing individual liability" on a cat's paw theory in a § 1983 claim and also recognizing cat's paw liability under § 1981); *but see Coleman v. Dunlap*, 695 F.3d 650, 654 (7th Cir. 2012) (questioning in dicta whether cat's paw theory

is available in § 1983 cases where vicarious liability is ordinarily inapplicable).  To lead to a finding of liability, however, such a theory requires proof of an impermissible motive on the part of the person influencing the decisionmaker.  Having concluded that plaintiff could not establish retaliatory motive for any of the defendants for reasons discussed above, even a cat's paw theory of liability cannot be supported.

Accordingly, defendants are entitled to summary judgment on plaintiff's remaining claims.

## ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #65) on all claims is GRANTED.

2) Plaintiff's motion to strike defendants' reply as untimely (dkt. # 83) is DENIED.

1) The clerk of court is directed to enter judgment consistent with this order and close this case.

Entered this 7th day of November, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge